JOURNAL ENTRY AND OPINION
This is an appeal by the mother from an order of Visiting Juvenile Judge Joseph Zieba granting permanent custody of her four children to the Cuyahoga County Department of Children and Family Services (CCDCFS). She claims, on appeal, that it was error to permit the amendment of the custody complaint from temporary to that of permanent custody on the day of the adjudicatory hearing; she was denied effective assistance of counsel; and the decision was not supported by sufficient evidence. We affirm.
Prior to the events leading to this case, three of the mother's children: Cy, born October 1994, Ca, born April 1996, and Ch, born December 1997, had been in the continuous temporary custody of CCDCFS for as long as four years because of various refilings. Ce was born in June of 1999, and remained with his mother. CCDCFS returned custody of the other three children to her in March, 2000.
Margie Jennings, director of the school where Ca, then four years old, and Ch, almost three years old, attended day care, stated that in November 2000, a teacher told her that Ch was missing a baby tooth and, at his age, it was not natural to loose any. A month later she noticed that Ch had a black eye and swollen jaw, but was told by both the boy and his mother that he ran into a door. In her opinion, these were red flags indicating possible abuse. Then in January, 2001, Ms. Jennings noticed a gash over the child's eye, and reported her suspicion of abuse to CCDCFS.
When the mother refused to voluntarily cooperate with the agency's personnel in identifying and correcting potential problems in the home, Jennifer Fow, a social worker, was assigned to the case and has been involved ever since.
On March 26, 2001, during a routine inspection of rental properties in Cleveland Heights, Housing Inspector Lynn Nearon visited the mother's home and discovered many violations, including excessive clutter constituting a fire hazard in the basement, unsanitary conditions in the kitchen, and obstructions and unsanitary conditions in the various stairwells, hallways and bedrooms on the upper floors of the house. Ms. Nearon then called the agency's 696-KIDS hotline to report the high state of disorder, and claimed that the mother later called her and began screaming at her for making the referral.
In early April, 2001, when Ms. Fow attempted to check on the status of the mother's efforts to remedy unsanitary or unsafe conditions, the mother refused her entry. The agency obtained an emergency temporary custody order, and Ms. Fow proceeded to the home with a police officer to execute it. Because the mother did allow Ms. Fow into the home to verify that its condition had improved on that day, removing the children became unnecessary.
Janice Moore, the pre-school secretary, stated that when Ca and Ch arrived on April 26, 2001, the boy was crying, had difficulty walking, and was holding onto, and leaning against an unidentified man who had brought the children that morning. Kelly Bodner, a teacher, noted that the boy was having difficulty sitting in his chair for breakfast. When asked what was wrong with her brother, Ca told Ms. Moore his butt was bleeding, and she told Ms. Bodner that their mother had spanked him with a high-heeled shoe.
The women took the boy to a nearby bathroom and discovered that his buttocks were swollen, bruised and raw, with freshly broken skin; and noted that his right hand was swollen and red, and he had a black eye. They called the police and CCDCFS.
Leslie Campbell, an on-site social worker at the pre-school, asked Ch what had happened, and he told her that mommy spanked me. The police arrived, interviewed the children and the school employees and took photographs of the injuries. Cleveland Heights Police Officer Brian Loretz testified that Ca told him that their mother had spanked Ch the night before, and that he got spanked a lot, but she never did. Officer Loretz filed child abuse charges against the mother and issued a warrant for her arrest, which was executed the next day.
CCDCFS also filed a Complaint for Abuse, Neglect and Permanent Custody of all four children on April 27, 2001. While the motion was so titled, the language used in the body of the complaint prayed for temporary custody only. It is noteworthy that in October, 2000, the mother had been arrested on a charge of possession of cocaine and, in April of 2001, was arraigned on an indictment stemming from that arrest. The possession charge was still pending prior to the decision in this case.
At a hearing on the agency's motion for pre-dispositional temporary custody, before Magistrate Dana Chavers, Ms. Fow testified about the circumstances leading to removal of the children and the mother admitted that she struck Ch ten to fifteen times with a flat heeled shoe on April 25, 2001. She claimed the beating to be the result of a combination of behaviors on his part, including wetting himself and opening a third-story window onto the roof of the home, out of which Ce, not quite two years old, had begun to crawl. She explained that her son's hand injury occurred when he attempted to block her blows with a flat heeled shoe and the severe injuries to his buttocks must have occurred when he fell down approximately twenty wooden steps between the first and second floor on the morning of April 26th.
She testified that, after he tumbled head over heels down the steps, he simply bounced up, unhurt and not crying, and ate some cereal and watched cartoons until he left for day care that morning, and contended the other conditions observed by school personnel between November 2000 and January 2001, resulted from the child's chronic clumsiness. It was her layperson's opinion that Ch might have a medical problem affecting his equilibrium.
The magistrate granted pre-dispositional custody to CCDCFS and it was noted at the hearing, where the mother was represented by an attorney, that the agency was seeking permanent custody of all the children. Additionally, when the mother denied the allegations of the complaint on May 30, 2001, at the arraignment before Visiting Judge Joseph Nahra, it was specifically stated that the CCDCFS was seeking permanent custody of all four children.
On June 4, 2001, Judge Zieba noted, on the record at a preliminary hearing, that the proceedings involved the determination of whether the agency would be entitled to permanent custody of the children, and the mother was present and represented by another attorney. At the opening of the adjudicatory hearing on June 29, 2001, a Friday, the judge again noted the nature of the proceedings involved the determination of permanent custody of the children, and neither mother's attorney nor her guardian ad litem lodged any objection.
After the mother's GAL noticed that the complaint was captioned as seeking permanent custody, but the body of the complaint contained an erroneous prayer for temporary custody, CCDCFS's attorney filed an amended complaint that same day and noted on the record, July 2, 2001, that he had so filed. He also stated on the record that, that morning, he had personally served a copy of the amended complaint on the mother's lawyer and on both her GAL and that of the children. While mother's lawyer did object to the filing of the amended complaint, his objection was not premised on surprise or lack of preparation, given the nature of relief requested, but raised several discovery issues that may or may not have been present, regardless of whether CCDCFS had been requesting temporary or permanent custody of the children. After hearing evidence on the above facts of the case, the judge adjudicated the children abused and neglected, according to R.C. 2151.031 and R.C. 2151.03.
Following the above ruling, the agency implemented a case plan to address the potential issues that impaired the mother's ability to care for her children. It included mandated programs for batterer's intervention, anger management and parenting skills, and psychological, drug abuse and housing assessments.
On August 21 and 24, 2001, the judge conducted the dispositional phase of the hearing to determine the ultimate custody of the children. The mother had not attended any type of counseling or participated in any assessment ordered by her case plan, and consistently refused to sign record release forms which would have enabled the agency to provide those programs or assessments for her. While she claimed to have undergone five court-ordered psychological assessments and numerous clean drug tests since 1998, she produced no documentation to prove it. She contended that it was not appropriate for CCDCFS to know of the details of any treatment she received; to her, an acknowledgment from a service provider that any given treatment had been completed should have been enough. She asserted that she refused to sign record release forms to enable CCDCFS to provide her records to service providers because the records were full of untrue allegations.
The mother complained that she does not trust the agency because of her past dealings in connection with the earlier removals of her three older children, and that CCDCFS did not try or want to help her, but rather, would just keep digging and ordering evaluations until it had a basis for the award of permanent custody for itself.
From the time the children were taken from her custody, the mother had been granted visitation with them every other weekend. Marylou Coleman, a social worker who drove the children from their foster home to the mother, testified that the children were doing very well and bonding with their foster parents. She stated that Ch was very afraid of his mother and that, on one occasion, he threw a tantrum and would not go with the other children to visit, and spent the day with Coleman instead. She noted that Ca had expressed a desire to stay with the mother after one visit, but that none of the other children expressed any such desire.
The children's maternal grandfather testified that, at present, his daughter was a good mother, acknowledged that she had drug problems in the past, and confirmed the mother's testimony that Ch was accident prone or fell down a lot.
Patrick Lavelle, the children's GAL, filed a recommendation that permanent custody be awarded to CCDCFS, and stated, on the record, My recommendation is permanent custody. I can't urge it any stronger. If the kids are returned home, they will be in danger. At the conclusion of the hearing, the judge granted permanent custody of all four children to CCDCFS. By journal entry filed September 10, 2001, the judge ruled that clear and convincing evidence existed to find that the children could not be placed with their natural parents within a reasonable amount of time or should not be placed with the mother or any father of the children,[1]
and that vesting CCDCFS with permanent custody was in the best interest of the children, based on the following:
 1. Mother has failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home;
 2. The Mother has failed to complete a case plan;
 3. Mother has placed the children at substantial risk of harm two or more times due to drug abuse and has rejected treatment two or more times and has refused to participate in further treatment;
 4. The Mother has committed abuse as described in section 2151.031 of the revised code against the children or allowed the children to suffer neglect as described in section 2151.03 of the revised code, and the likelihood of recurrence of the abuse or neglect makes the children's placement with the Mother a threat to the children's safety.
Three of the mother's five assignments of error state:
 I. The Trial Court Erred When it Granted the Appellee's Motion to Amend the Prayer of the Complaint from Temporary Custody to Permanent Custody on the Date of the Adjudicatory Hearing and over Appellant's Objection Through Counsel.
 IV. The Trial Court Did Not Have Proper Subject Matter Jurisdiction to Grant Permanent Custody of Appellant's Children to the Cuyahoga County Department of Children and Family Services.
 V. The Trial Court's Decision to Grant the Appellee's Oral Motion to Amend the Prayer of the Complaint to Permanent Custody on the Day of Trial Violated Appellant's Right to Procedural Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Section 16 Article I [sic] of the Ohio Constitution.
Since these three assignments of error share common law and analysis, they will be discussed together. The mother challenges amending the prayer of the complaint for permanent custody to state that permanent custody was being sought by CCDCFS, on the grounds that the amendment violated her constitutional rights and was procedurally improper. We disagree.
At the outset, we find that, while she argues that the juvenile court had no jurisdiction to award the agency permanent custody because it had not validly served her with an amended complaint, CCDCFS's attorney specifically stated on the record on July 2, 2001, that he had personally served it on both GAL's and the mother's attorney. Based upon the plain record, the premise for this specific error the mother now asserts is undisputably lacking and is not well taken, to that extent.
In the context of permanent custody proceedings, parents are entitled to procedural and substantive due process of law because the right to raise one's children is a recognized, fundamental liberty interest deserving of such protection.[2] In In re Fleming,[3] this court explained the nature of the right of a litigant to due process of law as follows:
 The Fourteenth Amendment to the United States Constitution, as well as Section 16, Article I, of the Ohio Constitution, guarantees that no person shall be deprived of life, liberty, or property without due process of law. Due process of law implies, in its most comprehensive sense, the right of the person affected thereby to be present before the tribunal which pronounces judgment upon a question of life, liberty or property, to be heard, by testimony or otherwise, and to have the right of controverting, by proof, every material fact which bears on the question of right in the manner involved. * * *
What process is due depends upon the private interest affected by the government action, the risk of erroneous deprivation and the value of additional safeguards, and the government's interest, including the importance of the function and the fiscal and administrative burden. * * * The most basic consideration of constitutional due process is whether the person being deprived of a liberty or property interest has been given an opportunity to be heard at a meaningful time and in a meaningful manner. * * *[4]
Specific to proceedings involving contested child custody determinations, the procedural protections afforded by Chapter 2151 exist so that parents will be assured of the ability to know the facts underlying any motion made for permanent custody so they can prepare a defense.[5] According to Juv.R. 22(B), Any pleading may be amended at any time prior to the adjudicatory hearing. After commencement of the adjudicatory hearing, a pleading may be amended * * * if the interests of justice require, upon order of court. * * * Where requested, a court order shall grant a party reasonable time in which to respond to an amendment. According to Juv.R. 19, in relevant part, A motion other than one made at trial or hearing shall be in writing unless the court permits it to be made orally.
Since CCDCFS's motion to amend the complaint in this case was made during the adjudicatory phase of the proceedings, it was properly accepted as an oral motion pursuant to Juv.R. 19, and was properly entertained by the judge under Juv.R. 22(B).
It is clear that the mother had a meaningful, complete opportunity to contest the amended permanent custody complaint; all parties were reminded at the outset of every single hearing, including the hearing to determine pre-dispositional custody, the mother's arraignment, a pre-hearing proceeding, and the adjudicatory and dispositional phases of actual hearing on the motion that this case involved CCDCFS's request for permanent custody of all the children, and she was served with a complaint specifically encaptioned as a complaint seeking permanent custody. Moreover, the agency was granted temporary custody of the children by the magistrate at the pre-dispositional custody hearing.
Her attorney's objection to the amendment was not premised on anything to do with the amendment, but was actually a discovery objection affecting completely different issues than the technical, one-word amendment to the complaint that all parties had known was filed in pursuit of permanent custody. In re Vandivner, now cited by the mother in support of reversal on due process grounds, stands for the proposition that a parent's attorney may provide ineffective assistance if she admits to the judge that she is unprepared for hearing, yet goes forward in spite of that fact. Far more persuasive is our decision in In re Carter,[6] where we upheld a judge's decision to permit the amendment of a complaint to request relief other than that originally requested, and where the parent neither objected on grounds of prejudice to her ability to defend herself, nor requested a continuance under Juv.R. 22(B) in order to prepare a defense to the amended pleading.
We express concern over what appears to be a cut and paste approach to the drafting of documents that can result in the total destruction of parental rights equivalent to a death penalty in a criminal case.[7]
While characterized as a clerical error, the word temporary custody instead of permanent custody in the prayer of the complaint, despite the caption, presents an ambiguity to the reader. State v. Pless,[8] held that the requirements of R.C. 2945.05 were clear and not susceptible to a merely substantial compliance interpretation. So, too, are the requirements of R.C. 2151.414. While the mother may have received the Summons/Notice that satisfied those mandated advisories before July 2, 2001, it is unclear from the record whether, after the complaint was amended and an agreed upon date for the dispositional hearing set, the mandated notice was given. In any event, the amended complaint does contain a definition of permanent custody which does state that the action can divest the parents of their parental rights, although not as thoroughly as the explanation contained on prior Summons/Notices. The fact that the mother had retained counsel negated the statutory requirement that she be advised about her right to appointed counsel if indigent. Based upon the record here, we would be hard pressed to find any prejudice to the mother, however, that may not always be the case.
We overrule these assignments of error.
 II. Appellant Was Deprived of Her Right to Effective Assistance of Counsel Due to the Refusal of Her Retained Counsel to Attend a Single Hearing Throughout the Proceedings below and His Complete Abandonment of Appellant as a Client.
Here, the mother claims she retained Michael Troy Watson to defend her, yet she was represented by Harvey McGowan at the hearing for pre-dispositional temporary custody, Scott Ramsey at the adjudicatory phase of hearing on the complaint for permanent custody, and G. Michael Goins at the dispositional phase of hearing on the complaint. She contends she did not consent to any substitution of counsel, and that the lawyers who appeared for her in Watson's stead were incompetent and uninformed.
A defendant who claims ineffective assistance must show (1) deficient performance by counsel, and (2) resulting prejudice.[9] The performance inquiry requires the reviewing court to ask whether, under the totality of the circumstances, "counsel's representation fell below an objective standard of reasonableness."[10] The prejudice inquiry involves a determination whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[11] The burden of proof lies with the appellant.[12]
Nothing in the record, however, indicates that the mother was either unfamiliar with any of her counsel or unhappy to have them represent her. The record does note that the dispositional phase of the hearing on the complaint was set for August 21, 2001, it was reset to August 24th because Watson never appeared, and Goins appeared on that date on her behalf. If Watson did anything to constitute ineffective assistance by failing to appear, no prejudice resulted, since the hearing was simply reset.
Contrary to the mother's conclusory assertions, made without citation to any transcript of proceedings to demonstrate ineffectiveness, we find that each of her lawyers provided her with acceptable representation and were, in fact, prepared for each hearing. Each effectively examined or cross-examined witnesses where applicable, and presented her defense: that she did not abuse Ch, and any lack of success she had in attaining suitable treatment under her case plan was the fault of CCDCFS.
While the mother asserts that, had Watson advised her to sign the record release forms needed to begin the assessment/referral process to complete her case plan, she would have done so, it is questionable whether that would be a suitable subject for legal advice. When it was pointed out that she was refusing to sign the record releases, the judge unambiguously ordered her in open court on June 4, 2001, Sign what has to be signed. If you don't, I'll sign it for you. The judge's June 5, 2001, journal entry includes the order, IT IS FURTHER ORDERED THAT the mother shall sign releases for pertinent information as requested by the CCDCFS social worker.
By refusing to sign release forms and effectively preventing implementation of her case plan, the mother acted with contempt of a court order she heard with her own ears. We cannot conclude that she received ineffective assistance of counsel. The Ohio and Federal Constitutions do not require the effective assistance of a specific lawyer, to the extent that is possible. They merely require effective assistance of a lawyer, which the mother received. This assignment of error is without merit.
 III. The Decision of the Trial Court to Grant Permanent Custody of Appellant's Four (4) Minor Children to the Cuyahoga County Department of Children and Family Services Was Not Based upon Sufficient Evidence as Required by Ohio Revised Code 2151.414(B) and (E) and Was Therefore Reversible Error.
According to R.C. 2151.414, in relevant part:
 (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (B)(1)(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 (D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 [2151.35.3] or division (C) of section 2151.415 [2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (D)(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (D)(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (D)(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (D)(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
 (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
[2151.35.3] of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (15) The parent has committed abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
Clear and convincing evidence is that measure or degree of proof which is more that a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.[13]
If a burden of proof must be met with clear and convincing evidence, a reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy that burden of proof.[14]
In this case, there was evidence of suspected past incidents of abuse of Ch through the various injuries he exhibited at his pre-school during late 2000 and January of 2001. Ca stated to police that Ch received spankings a lot, opening the door to the inference that the April 25, 2001 spanking was not a one-time or even infrequent occurrence. The photographs taken of the boy on April 26, 2001, speak for themselves: they show a blackened eye, a swollen, injured hand and grotesquely red, swollen and bruised buttocks, with much broken skin. The mother's admission that she struck him ten to fifteen times with a shoe, and that he hurt his hand trying to shield himself from her blows, is as revealing as it is tragic.
There was evidence that the mother was completely uncooperative in signing the release forms to obtain necessary treatment and, while she claimed that she had attempted to secure services on her own, even if she would have, CCDCFS could not suitably monitor her progress without a release for whatever service provider she chose, and would have no control over the case background information that she would provide to any such provider.
In the end, the mother both denied her culpability for the abuse she inflicted on her son and refused to submit to the agency's order that she obtain help for her anger, parenting and self-control issues. We conclude it was not error for the judge to find that, by clear and convincing evidence, the children should not be placed with their mother because she failed to remedy the problems causing their removal and failed to even begin, much less complete, her assigned case plan.[15] Additionally, under R.C. 2151.414(E)(16), it was not error to find that, considering her denial of a problem and effort to remedy it, the likelihood of recurrence of abuse to Ch, or any of his siblings, was high. We also find no error in the determination that it is in the best interest of the children that they be removed, under R.C. 2151.414(D), considering the custodial histories of Cy, Ca, and Ch, and the need for all the children to have a legally secure permanent placement where, as Ms. Coleman testified, the children are doing very well. This assignment of error is overruled.
Judgment affirmed.
It is ordered that the appellee recover from appellant costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., And FRANK D. CELEBREZZE, JR., J., CONCUR
[1] Ch's, father appeared at hearing on July 29, 2001, and admitted the allegations in the complaint as they applied to him. He is not part of this appeal. The other fathers are identified as John Doe.
[2] In re Hitchcock (1996), 120 Ohio App.3d 88, 101.
[3] (Jul. 22, 1993), Cuyahoga App. No. 63911.
[4] Id. (Internal cites omitted).
[5] In re Fleming, supra.
[6] (Aug. 10, 2000), Cuyahoga App. No. 75857.
[7] In re Hitchcock (1996), 120 Ohio App.3d 88.
[8] (1996), 74 Ohio St.3d 333.
[9] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[10] Id. at 688, 104 S.Ct. 2052.
[11] Id. at 694, 104 S.Ct. 2052.
[12] State v. Hamblin (1988), 37 Ohio St.3d 153, 156, 524 N.E.2d 476, certiorari denied (1988), 488 U.S. 975, 109 S.Ct. 515.
[13] Cross v. Ledford (1954), 1612 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; In re Adoption of Holdcomb (1985),18 Ohio St.3d 361, 368, 481 N.E.2d 613, 620.
[14] In re Adoption of Holdcomb (1985), 18 Ohio St.3d 361,481 N.E.2d 613.
[15] R.C. 2151.414(E)(1).